## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DENISE BECKLES-CAMMON,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.:** |
| | : | |
| V. | : | |
| | : | |
| **GENERAL ELECTRIC CAPITAL** | : | |
| **CORPORATION and GENERAL** | : | ***JURY TRIAL DEMANDED*** |
| **ELECTRIC COMPANY,** | : | |
| | : | **SEPTEMBER 8, 2010** |
| **Defendants.** | : | |

### COMPLAINT

Plaintiff Denise Beckles-Cammon brings this action against General Electric Company and General Electric Capital Corporation seeking back pay, money damages, and other legal and equitable relief against said defendants for discriminating against her on the basis of race, as well as retaliation, in violation of Title VII, 42 U.S.C. §1981, and the Connecticut Fair Employment Practices Act ("CFEPA"). In addition, plaintiff seeks damages for violation of common law, specifically promissory estoppel, and negligent misrepresentation.

### *PARTIES*

1. Plaintiff Denise Beckles-Cammon is a resident of the State of Connecticut, having her principal residence in Stamford, Connecticut. Ms. Beckles-Cammon is African American.

2. Defendant General Electric Capital Corporation ("GE Capital") is a Delaware corporation, having its principal place of business in Norwalk, Connecticut.

3. Defendant General Electric Company (hereinafter "GE") is a New York corporation, having its principal place of business in Fairfield, Connecticut, and through its subsidiary, General Electric Capital Services, Inc., operates and controls defendant GE Capital.

4.      Defendants should be viewed as a single entity, single employer and/or alter egos of each other. Among all of the defendants there is (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

### *JURISDICTION AND VENUE*

5.      Jurisdiction over the subject matter of this litigation exists under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, the Civil Rights Act of 1991, and 42 U.S.C. §1981. As to those claims arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this court, jurisdiction exists under the doctrine of supplemental jurisdiction as codified in 28 U.S.C. §1367.

6.      Plaintiff timely filed administrative charges of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and Equal Employment Opportunity Commission ("EEOC") and has received a Right to Sue letter from the EEOC dated June 24, as well as a Release to Sue from the CHRO dated July 15, 2010. Copies are attached hereto as Exhibits A and B, respectively.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut and both parties reside in the District.

### STATEMENT OF FACTS

8.      Defendant GE Capital provides various financial products and services worldwide, including commercial lending and leasing, consumer and retailer credit, leases and loans, real estate capital and investment solutions, energy financial services and commercial aviation services. It is headquartered in Norwalk, Connecticut and has over 73,000 employees, assets of approximately $500 billion, and is one of four business units of defendant General Electric Company, which sets and controls many of GE Capital's employment policies and practices (with GE Capital, collectively referred to as "GE").

9.      Plaintiff possesses a Masters in Business Administration and a B.S. in accounting and finance from Clarkson University and is a certified public accountant. She has been working in the financial field since 1989 and has substantial experience managing multi-location financial teams, working in areas of strategic financial analysis, budgeting and forecasting, and cost control and financial process re-engineering.

10.      Plaintiff joined GE Capital in June of 2000 in the position of Manager, International Cash Operations, and was responsible for International Cash Operations across GE Capital supervising a staff of four in the U.S. and seven in India. Prior to joining GE Capital, plaintiff held positions as a Senior Auditor of Deloitte & Touche, a Global Financial Analyst at Haagen Dazs, Assistant Controller at the AFL-CIO, and Director, Corporate Accounting and Reporting at MasterCard, Inc.

11.      After joining GE, plaintiff's role was expanded over the ensuing three years (2001-2003) to include cash operations for defendant GE, international and domestic, treasury accounting integration, and account reconciliations for the treasury balance sheet. During this period, plaintiff was selected as one of GE's High Potential Minority Candidates. Also during

this period plaintiff noticed that her only female African-American report was paid substantially less than her peers despite her superior qualifications and performance. Plaintiff attempted to rectify this situation through upper management and was able to secure a 10% raise for her, but was ultimately unable to bring her in line with other members of the team. Plaintiff's manager at the time likewise apologized to plaintiff for the low level of her salary.

12.     In late summer 2003, plaintiff was promoted to the position of Manger of Finance, Global Controllership, GE Real Estate. Just prior to this, plaintiff had been approached by Keith Sherin, the Chief Financial Officer of GE, who offered to assist her in her career development and indicated he felt she had a promising career at GE.

13.     Shortly thereafter, in the spring of 2004, Mr. Sherin arranged for plaintiff to interview with Ms. Maive Scully, CFO of GE Capital, Consumer Finance, who offered plaintiff a role as Assistant Controller of GE Money. This offer was subsequently retracted when the CFO of GE Real Estate, Stewart Koenigsberg, contacted her asking that she refrain from doing so as there was no reason that Keith Sherin should be showing plaintiff support over his team (all of whom were Caucasian and only one of whom was female).

14.     Plaintiff, in turn, began reporting to a new manager, a white male named Roger Favano, who when meeting with plaintiff for the first time indicated he felt plaintiff was "overpaid" and compared her to the clerks on his team who were not college educated. At that time, he stated he did not know why Mr. Sherin felt plaintiff was a rising star, as "others" were more "deserving," citing in particular two white males.

15.     Plaintiff received little support from Mr. Favano, who removed plaintiff from the list of likely candidates to be promoted to Executive Band ("E-Band"), the next level beyond plaintiff's level as a Senior Professional. Despite the lack of support, plaintiff managed a team

4

which reconciled the inter-company accounts across the business and designed a new process for doing so. While plaintiff received a bonus for this work, credit for the design of the system was given to a white male replacement after plaintiff was transferred to another position.

16.     The new position for plaintiff was Assistant Regional Controller, EMEA GE Company. In this role plaintiff worked across all GE business with over 200 Controllers. She performed well, and one of her supervisors, Liam Keys, a white male, indicated he was surprised at how effective plaintiff was given that she was a "colored woman." In the meantime, one of plaintiff's other managers, a GE Company Officer, Phil Ameen, Vice President and Comptroller, was working to try to get plaintiff into an E-Band position in Controllership or as a unit CFO.

17.     Plaintiff was told by GE Human Resources senior management that despite Mr. Ameen's support, plaintiff would not get the roles he was recommending until plaintiff first took a position in Financial Planning & Analysis ("FP&A"). Human Resources told plaintiff she needed to take such a role at GE Capital Finance for 18 months as a "final stamp," after which plaintiff would become E-Band and be able to take on the recommended CFO-type roles.

18.     In late 2007, plaintiff became one of two lead analysts responsible for three segments within FP&A with GE Capital Finance reporting to a white male, Diarmuid Hogan. In this role plaintiff was given little training, was isolated, and was given work no one else wanted to do. Plaintiff was treated with disrespect compared to her Caucasian co-workers. While plaintiff was placed on the E-Band short list, out of 60 people, plaintiff was one of only two African-Americans and the only African-American female on that list.

19.     In early 2008, plaintiff's entire 2007 performance was reviewed along with that of her peers. She thereafter received a significant raise and stock options and "RSU" (restricted stock units), all items reserved for top performers. She was placed onto the 2008-2009 "Best

Bets" list, a list of those likely to be promoted to E-Band. Plaintiff also received a significant bonus for her performance. Such a bonus was only provided to high performers.

20.     In the fall of 2008, plaintiff went to GE's Human Resources department to complain about her work situation. About two days later, plaintiff's manager, Mr. Hogan, said that Human Resources had given him a "heads up." He apologized to plaintiff that her review was over nine months late and that he had spent little time with plaintiff.

21.     Thereafter, plaintiff was not included in meetings regarding the reorganization of her department despite the inclusion of her Caucasian peers. When plaintiff's supervisor finally gave her the late review, he limited it to 30 minutes instead of the standard 1 hour and concluded plaintiff should "go back to Controllership" and get out of FP&A. Plaintiff asked him if there was any criticism for the work she had done, to which Mr. Hogan stated no, but that he would only support recommending that plaintiff return to controllership. Such a recommendation would effectively eliminate plaintiff from contention for open CFO roles, perpetuating the pattern of GE to routinely award such roles to white males. Plaintiff told Mr. Hogan his review was neither fair nor accurate and was inconsistent with the little feedback she had been given. The conversation ended with plaintiff being simply asked to leave.

22.     Each day thereafter, plaintiff was increasingly excluded from important work and planning sessions. Plaintiff tried to set up another meeting with GE Human Resources but was told the earliest they could see plaintiff was December.

23.     In December 2008, plaintiff finally met again with GE Human Resources and complained. Plaintiff stated the review was unfair and contrary to her placement on the E-Band list, her raises, and the lack of any prior negative feedback. In response, plaintiff was told the E-

Band list was being revised "downwards" and that she should not expect to continue to be on that list.

24.     Plaintiff complained about the unfair review, her removal, post-complaint, from the "Best Bets" E-Band list, as well as of the isolation and unfair treatment by Mr. Hogan. In response, Human Resources (Ms. Jennifer Maslar) told plaintiff to create a "goals and objectives" document, since Mr. Hogan "was not the strongest manager." Plaintiff created such a document. Rather than use it as a guide to work with plaintiff, however, plaintiff's goals and objectives were apparently used to create two new E-Band openings in early 2009 incident to the merger of GE Money and GE Capital. Plaintiff was told her team was expanding with the addition of these two open E-Band spots. Plaintiff was also told she was not qualified for either role. Plaintiff reviewed the two E-Band job postings and contacted Mr. Keith Sherin, GE's CFO, to assist her in applying for one of the jobs, as the job descriptions included many duties and responsibilities plaintiff already performed.

25.     Plaintiff thereafter had a telephone "interview" with Peter Mondani, Manager Financial Leadership and Development of Human Resources, to discuss the open roles. After plaintiff mentioned that she had posted for one of them, plaintiff was told she was lucky to have a job, that the Obama administration was socialist and destroying the country, that he was a republican capitalist and that plaintiff should just put her head down and do her job. He went on to say that Mr. Hogan was really well regarded and plaintiff needed to be quiet and do her job. Mr. Mondani's speech was demeaning and appeared to be directed at plaintiff as an African-American employee. Plaintiff nevertheless posted for both E-Band roles and so informed her supervisor, Mr. Hogan.

26.     Plaintiff did not get either role. Instead, an individual with less experience (an Indian male) was promoted to E-Band and given one of the two roles. Plaintiff's job was modified to include training this male, as he took over responsibilities that used to be plaintiff's. The second open role went to a white male who also had to train.

27.     Plaintiff next learned she was demoted. She no longer reported directly to Mr. Hogan, but instead was moved down a level to report to one of the new E-Band roles (the white male).

28.     On or about May 20, 2009, plaintiff filed a written letter to Ms. Maslar alleging discrimination and retaliation. The written complaint recites the history of plaintiff's previous protected activity. Rather than undertake immediate professional and remedial action, or even to follow GE standard investigative procedures, Ms. Maslar began a course of action designed to put GE in the best legal posture possible.

29.     On or about May 27, 2009, plaintiff met with Human Resources. At that meeting, plaintiff was told the issues were not of discrimination, but instead of her own performance and that Human Resources would work with her toward "clarifying" her role.

30.     On May 28, 2009, plaintiff submitted an email to Human Resources requesting a full investigation of her claims, as well as reinstatement on the E-Band list. In response to this May 28, 2009 email, plaintiff received a reprimanding email from GE Human Resources. Instead of beginning an impartial investigation, Ms. Maslar reiterated that GE intended "to continue to provide role clarity and the coaching needed to develop [plaintiff's] FP&A skills."

31.     Feeling that Human Resources was trying to create a false record of misperception and performance problems, plaintiff replied on June 3, 2009, again reiterating the facts leading to the inescapable conclusion GE was not treating her, nor other African-American

females, in a fair manner. Indeed, one needed only look at the E-Band level and above in Finance

to see there was a dearth of African-American female representation. Plaintiff's desire was to set

out the facts in support of the need for a full and complete investigation.

32.     The next day, June 4, 2009, Ms. Maslar, in a clear GE advocate role, stated she

did not have the "same recollection of certain events" and stated once again:

> In the meantime, I would like to continue to work with you on role clarity and
> building your experience base. As described in my email, we will schedule a role
> clarity work-out with the FP&A team. After that, we can meet to discuss your
> specific role in the new Capital FP&A organization.

33.     That same day, June 4, 2009, GE's head of security, Mark Enright, opened an

investigation into plaintiff's GE laptop computer use.

34.     Ms. Maslar never contacted plaintiff again. The "role clarity" exercise was never

pursued. Instead, the discrimination claims were "investigated" by (1) Julia D. Gizoda, Manager

of Human Resources Corporate Initiatives Group, who reported to Gary Reiner, Head of

Technology and Sourcing (a GE officer); (2) Susan Yun, Vice President of Human Resources,

GE Capital Americas, who reports to Athena Kaviris, Senior Vice President Human Resources,

Americas. The first step in this "investigation" was a three-hour "interview" of plaintiff, despite

the plethora of detailed information already provided. Plaintiff was told there would be some

other interviews, some investigation, and then an "action plan" would issue. She was told that

she would be hearing from them soon.

35.     During the same time period, the "investigation" of plaintiff's computer usage

commenced, and Mr. Hogan, plaintiff's boss and the person primarily accused of discrimination

and retaliation, was interviewed. He alleged "wrongdoing" by plaintiff, specifically the

"wrongful" download of GE data. The Human Resources persons involved in the computer

download investigation were Cathy Desquesses, Human Resources Manager, who is a colleague

and peer of Ms. Maslar. In fact, during this time period, they were exchanging and sharing duties. Also, both reported to Nancy Abbot, who is the peer of Athena Kravis, Senior Vice President of Human Resources, GE Capital Americas.

36.     On or about June 11, 2009, plaintiff was summoned to a meeting with the head of security for GE Capital, Mark Enright, and Human Resources Manager, Cathy Desquesses. Plaintiff was told her laptop had been "monitored" and that she had downloaded numerous files they "presumed" were GE files and they "wanted them back." Plaintiff explained that in mid-May she had taken an online training session that indicated GE did not want music and personal files on its company laptops and so her music and personal files were downloaded to a pin drive. (GE had assisted plaintiff in uploading these very same files to her laptop in the first place.) Plaintiff was told the download was a "problem" and that they "knew" she had taken GE proprietary data, accusing plaintiff of theft. Plaintiff was told to leave, that they would continue the investigation.

37.     Plaintiff went to her office and started her laptop and typed in her password. GE security then came into her office and took her computer. They informed plaintiff she was suspended with pay, whereafter plaintiff was immediately escorted out of the building.

38.     When plaintiff got home, she learned her husband, who is Caucasian and also works for GE, had been contacted by GE's head of security and the same Human Resources manager by telephone as well.

39.     Later his computer was taken and copied and returned. He was told plaintiff's "case" was under investigation.

40.     Plaintiff was summoned back to GE from her home on two more occasions. The first time was on June 12, 2009, the day following her suspension. When plaintiff arrived at GE,

she was paraded before her peers by security and escorted into a room and interrogated. Plaintiff was again accused of being a thief, asked the same questions, probed for inconsistencies, and berated. She was then again escorted off the premises.

41.     The following week, on or about June 19, 2009, plaintiff was again summoned back to GE. She was told she could not bring an attorney. This time Athena Kaviris, Senior Vice President of Human Resources (to whom Susan Yun reports) and the GE head of security were present. Plaintiff was then told that due to her downloading of "GE information" the prior month and the fact there were inconsistencies between her statement and those of her husband, namely: (1) the description of the nature of the drive onto which the items were downloaded, and (2) the fact plaintiff allegedly said they ended up on her desktop and her husband said it was a laptop. Plaintiff informed them she was being misquoted. However, plaintiff was told to be quiet, that she was terminated effective immediately for violation of GE's "Spirit and the Letter,"[1] and that to help with a "cushion," plaintiff would be paid a severance of two months, but *only if* plaintiff signed a release agreeing not to sue GE.

42.     Plaintiff was then escorted off the property.

43.     A few days after June 19, plaintiff received a call from Julie Grzeda stating the discrimination investigation "had been concluded" and found baseless. Later, on June 26, 2009, plaintiff was told that due to the computer wrongdoing, she would receive no pay while she considered the release and severance offer given her. The next month, presumably after GE attorneys became more fully involved, GE later attempted to backtrack via letter stating that plaintiff had somehow "resigned."

---

[1] The "Spirit and the Letter" is, among other things, a code of conduct signed by GE employees outlining ethical conduct obligations.

## *FIRST COUNT*
### *(29 U.S.C. §2000e, Title VII – Discrimination)*

44.     Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

45.     Defendants are an "employer" as defined by 42 U.S.C. §2000e(b).

46.     Defendants, at all times relevant hereto, have employed more than 15 employees.

47.     Defendants' conduct, by and through their agents, in treating plaintiff in the manner unequal to other employees, discriminatorily denied plaintiff equal treatment on the basis of race in violation of Title VII, as amended by the Civil Rights Act of 1991.

48.     Defendants, in failing to adequately investigate and remedy the treatment to which plaintiff was subjected, despite defendants' knowledge of the conduct, discriminatorily denied plaintiff equal treatment on the basis of race in violation of Title VII.

49.     Defendants subjected plaintiff to illegal discrimination. Moreover, defendants unreasonably interfered with plaintiff's work performance, and plaintiff's complaints of discrimination were used by defendants as a basis for adverse employment decisions affecting plaintiff.

50.     As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

### *SECOND COUNT*
### *(42 U.S.C. 1981, et seq. – Discrimination)*

51.      Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

52.      Defendants' conduct, by and through their agents, in treating plaintiff in the manner unequal to other employees, discriminatorily denied plaintiff equal treatment on the basis of race in violation of 42 U.S.C. §1981.

53.      Defendants, in failing to adequately investigate and remedy the treatment to which plaintiff was subjected, despite defendants' knowledge of the conduct, discriminatorily denied plaintiff equal treatment on the basis of race in violation of 42 U.S.C. §1981.

54.      Moreover, once plaintiff attempted to protect her right to equal treatment, defendants retaliated against her in violation of 42 U.S.C. §1981.

55.      The discriminatory acts of defendants as described above were intentional and were motivated on the basis of plaintiff's race.

56.      As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

### *THIRD COUNT*
### *(46A-60(a), et seq., CFEPA- Discrimination)*

57.      Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

58.      Plaintiff was, at all times relevant hereto, an employee as that term is defined in Connecticut General Statutes §46a-51(9).

59.      Defendants are employers as that term is defined in Connecticut General Statutes §46a-51(10).

60.     At all relevant times hereto, defendants employed more than three persons.

61.     The acts of defendants as described above were motivated on the basis of plaintiff's race in violation of Connecticut General Statutes §46a-60(a), *et seq*.

62.     Said discrimination was willful, and defendants had knowledge that the above-described acts were in violation of Connecticut General Statutes §46a-60(a), or had a reckless disregard for the provisions of said statute.

63.     As a direct and proximate result of the defendants' conduct, plaintiff has suffered and will continue to suffer damages, including but not limited to substantial loss in earnings and loss of material employment benefits.

### FOURTH COUNT
### *(42 U.S.C. §2000e-3 (TITLE VII) – Retaliation)*

59.     Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

60.     The actions of defendants were taken in retaliation for plaintiff's effort to protect her rights in violation of 42 U.S.C. §2000e-3, Title VII.

61.     As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

### FIFTH COUNT
### *(42 U.S.C. §1981, et seq. – Retaliation)*

62.     Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

63.     Defendants' conduct, by and through their agents, in treating plaintiff in the manner unequal to other employees, discriminatorily denied plaintiff equal treatment on the basis of race in violation of 42 U.S.C. §1981.

14

64.     Defendants, in failing to adequately investigate and remedy the treatment to which plaintiff was subjected, despite defendants' knowledge of the conduct, discriminatorily denied plaintiff equal treatment on the basis of race in violation of 42 U.S.C. §1981.

65.     Moreover, once plaintiff attempted to protect her right to equal treatment, defendants retaliated against her in violation of 42 U.S.C. §1981.

66.     The retaliatory acts of defendants as described above were intentional and were motivated on the basis of plaintiff's race.

67.     As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

### SIXTH COUNT
##### (Connecticut General Statutes §46a-60(4)  –  Retaliation)

68.     Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

69.     The actions of defendants were taken in retaliation for plaintiff's effort to protect her rights in violation of C.G.S. §46a-60(4).

70.     As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

### SEVENTH COUNT
##### (Promissory Estoppel)

71.     Plaintiff hereby repeats and realleges paragraphs 1-43 as if more fully set forth herein.

72.     In making her complaints to Human Resources, plaintiff relied upon GE's representations set forth in its employment practices document entitled "Spirit and the Letter" in

which GE represented and assured plaintiff it would not retaliate against any employee who in good faith submitted a grievance of unfair treatment.

73.     The representation by defendants to plaintiff set forth in said document was made to induce plaintiff to rely thereon, and plaintiff did so rely to her detriment.

74.     As a result of said promise and plaintiff's reliance thereon, defendants are bound by said representation.

75.     Defendants breach this representation, and as a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional upset.

### *EIGHTH COUNT*
### *(Negligent Misrepresentation)*

76.     Plaintiff hereby repeats and realleges paragraphs 1-43 and 72 as if more fully set forth herein.

77.     The foregoing representation and promise set forth in the "Spirit and the Letter" document, was made in the course of business, and was made by defendants without exercise of reasonable care and competence in obtaining or communicating the information contained therein.

78.     Plaintiff relied on this false representation in the conduct of her activities and in making her decisions regarding employment and was damaged thereby.

79.     As a result of defendants' conduct, plaintiff has suffered and will continue to suffer past and future economic, physical and emotional upset.

**WHEREFORE**, plaintiff is seeking:

1. Compensatory damages, including loss of enjoyment of life, emotional pain and suffering, back pay, bonuses, and the value of all other employment benefits in an amount to be determined by the trier of fact, with interest from the date when said sums were due;

2. Common law punitive damages;

3. Attorney's fees;

4. Prejudgment interest and costs;

5. An injunction permanently enjoining the defendant, its agents, employees, successors, assigns and all persons who acted in concert and participation with defendant, from engaging in any employment practice which discriminates on the basis of age, race and/or national origin; and

6. Such other and further relief as this Court shall deem just and proper.

By _____

Scott R. Lucas, ct00517
Lucas Bagnell LLC
18 Kings Highway North
Westport, CT 06880
(203) 227-8400
(203) 227-8402 (fax)
slucas@lucasbagnell.com

17

**EXHIBIT A**

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  Denise Beckles-Cammon<br>189 Riverbank Drive<br>Stamford, CT 06903 | From:  Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |

☐   *On behalf of person(s) aggrieved whose identity is*<br>    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2009-01310 | Anne R. Giantonio,<br>Intake Supervisor | (617) 565-3189 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*        JUN 2 4 2010

Enclosures(s)

**Robert L. Sanders,**<br>Area Office Director

*(Date Mailed)*

cc:  **GENERAL ELECTRIC CAPITAL CORP**<br>3135 Easton Turnpike<br>Fairfield, CT 06828

           **Lucas, Scott R**<br>           Stamford, CT 06901

**EXHIBIT B**

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Denise Beckles-Cammon**
COMPLAINANT

vs.                                                                    **DATE: July 15, 2010**

**General Electric Capital Corporation, a Division of GE Company**
RESPONDENT

CHRO Case No. 1020017

## RELEASE OF JURISDICTION

Pursuant to the request for a release of jurisdiction, the Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint in accordance with CONN. GEN. STAT. § 46a-101. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

**A copy of any civil action brought pursuant to this release must be served on the Commission at 21 Grand Street, Hartford, CT 06106 at the same time all other parties are served. THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

In granting this release, the Commission expressly finds in accordance with CONN. GEN. STAT. §§ 46a-100 and 46a-101(b) that all conditions precedent to the issuance of the release have been met. The complaint was timely filed under CONN. GEN. STAT. § 46a-82 and the complaint has been pending for a period of not less than 210 days. The complaint is not currently scheduled for public hearing nor is there reason to believe that the complaint will be resolved within a period of 30 days from the date the Commission received the request.

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

With the granting of this release of jurisdiction, the Commission administratively dismisses this complaint in accordance with CONN. GEN. STAT. § 46a-101(d) without cost or penalty to any party.

Very truly yours,

Robert J. Brothers, Jr.
Executive Director

cc: Complainant: Denise Beckles-Cammon
    Complainant's Attorney: Atty Claire E. Ryan and Atty Scott R. Lucas
    Respondent's Attorney: Atty Deborah E. Hryb
    Respondent's Contact: Nancy Abbott
    Regional Manager